AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No.   3:21MJ171 |
| A white Apple IPhone and a black Motorola Touch Screen Phone, currently located at the Dayton Police Department, 335 W. Third St., Dayton, OH | ) ) ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____ Southern _____ District of _____ Ohio _____, there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 922(g)(1) and 924(a)(2) | Being a Felon in Possession of a Firearm |
| 21 U.S.C. § 841(a)(1) | Possession with intent to distribute a controlled substance |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI TFO Dustin Phillips
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ FaceTime _____ *(specify reliable electronic means)*.

Date:  5/7/21
_____

City and state:  Dayton, Ohio
_____

_____
Sharon L. Ovington, U.S. Magistrate Judge
*Printed name and title*

DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

IN THE MATTER OF THE SEARCH OF
AN APPLE IPHONE, WHITE IN COLOR,
AND A MOTOROLA TOUCH SCREEN
PHONE, BLACK IN COLOR, currently
located at 335 West Third Street, Dayton,
Ohio

Case No. ___3:21MJ171___

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, **DUSTIN J. PHILLIPS**, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      Affiant is a Task Force Officer with the United States Federal Bureau of Investigation within the meaning of Title 21, United Stated Code ("U.S.C."), Section 878. That is, an officer of the United States who is empowered by law to conduct criminal investigations of and to make arrests for offenses enumerated in 21 and 18 U.S.C. § 878. Affiant is a law enforcement officer and has been employed as such for the past thirteen years. Since September 2013, Affiant has been assigned to the Dayton Police Department's Narcotics Bureau. Since approximately June 2015, Affiant has been a Task Force Officer with the FBI Safe Streets Task Force. Since 2007, Affiant has been employed as a Police Officer with the City of Dayton, Ohio. Since 2013, Affiant

has been dedicated to the investigation of narcotics, firearms and gang offenses. Affiant has been involved in firearm-related arrests, executed search warrants that resulted in the seizure of narcotics and firearms, participated in undercover narcotics purchases, and supervised the activities of informants who have provided information and assistance resulting in narcotics purchases. Affiant has previously obtained search warrants to examine cellular phones for evidence of drug trafficking and other crimes, and is familiar with techniques used to search cellular phones for electronic evidence as well as the role of cellular phones in drug trafficking.

3.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.     The property to be searched are two cellular phones, namely

a.  Apple iPhone, white in color ("**Device 1**");

b.  Motorola touch screen phone, black in color ("**Device 2**"),

hereinafter collectively referred to as the "**Devices**." The **Devices** are currently located at the Dayton Police Department located at 335 West Third Street, Dayton, Ohio.

5.     The applied-for warrant would authorize the forensic examination of the **Devices** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6.     On or about May 4, 2021, at approximately 1854 hours, Dayton Police Department Narcotics Bureau Detectives Lucas A. Rose and Christopher J. Savage were conducting surveillance in relation to a drug investigation on 1792 Vancouver Drive in Dayton, Ohio. Prior to

2

conducting surveillance, Detectives Rose and Savage were familiar with the residence, the suspected resident, EVANS, and had information that EVANS owns and drives a black Dodge Charger.

7.      Officers were conducting surveillance at the address because earlier that day, officers with the Dayton Police Department had responded to a call for the suspected overdose of Individual 1 in Dayton, Ohio. Officers arrived on the scene of the call and found Individual 1 non-responsive. Medics from the Dayton Fire Department also responded and administered care to Individual 1.

8.      Individual 2, a relative of Individual 1, told officers that Individual 1 entered the residence of EVANS earlier that day. Individual 2 told officers that Individual 1 had purchased drugs from EVANS and believed that Individual 1 was overdosing. Individual 2 told officers that Individual 1 occasionally smoked crack. Individual 2 knew that Individual 1 had purchased crack from EVANS for a long time, and that EVANS sells crack, but did not go inside the house with Individual 1 on that day.

9.      Individual 2 rode directly home with Individual 1, who did not stop anywhere else after exiting EVANS' house. Upon arriving home, Individual 1 went directly upstairs to Individual 1's bedroom. Individual 2 said that Individual 1 does not talk about Individual 1's drug use or use drugs in front of anyone else, but that Individual 2 knew that Individual 1 used crack cocaine because Individual 2 had found pipes and lighters with Individual 1 on numerous occasions. Individual 2 also stated that Individual 1 typically goes to Individual 1's bedroom alone after going to EVANS' house.

10.     Individual 2 described EVANS as a black male between 35 and 40 years old with long black dreadlocks and a medium/muscular build. Individual 2 told officers that EVANS lived

3

on the corner of Princeton Avenue and Vancouver Drive in Dayton, Ohio in a white house on a corner and had many cameras on the exterior. Individual 2 told officers that EVANS drove a black Dodge Charger with dark tint. Individual 2 also provided officers with a phone number Individual 2 stated belonged to EVANS. Individual 2 believed that Individual 1 contacted EVANS to purchase crack through an application on Individual 1's phone. Individual 1 was pronounced deceased at the scene after CPR and lifesaving measures were unsuccessful.

11. Officers examined Individual 1's phone and saw an application which indicated a contact between Individual 1's phone and the phone number that Individual 2 had provided for EVANS.

12. Officers also recovered two glass pipes from a trashcan near Individual 1's residence. A neighbor of Individual 1 had entered the home before officers arrived while other persons were attempting to render aid to Individual 1 had observed the pipes in Individual 1's home and removed them by throwing them in the trashcan. The neighbor informed officers that they did this because they did not want anyone to get in trouble. The neighbor directed officers to the trashcan where the glass pipes had been thrown. Officers recovered the glass pipes.

13. Officers observed that 1792 Vancouver Drive is located at the corner of Vancouver Drive and Princeton Drive. 1792 Vancouver Drive is a white house. A LEADS search also showed EVANS as residing at 1792 Vancouver Drive. During surveillance of 1792 Vancouver Drive, Detective Savage saw a black Dodge Charger, bearing Ohio license plate JES9534, pull into the driveway of the house. This vehicle was equipped with extremely dark window tint, which prevented detectives from being able to see inside the car. Detectives eventually ran the license plate on this vehicle and fount EVANS to be the registered owner. Detective Savage was able to see the car pull into the driveway, but could not see if/when anyone exited the car and approached

4

the house. Detective Rose was able to reposition his unmarked vehicle and after a short period of time, saw EVANS exit the front door of the house and get into the driver seat of the Charger. When EVANS came out the front door of the house, he was carrying a large white grocery bag, which appeared to contain at least one item of substantial weight. The vehicle left the driveway of 1792 Vancouver Drive and detectives followed it as it travelled through the neighborhood.

14.     Detectives requested a marked police cruiser respond to their location and attempt a traffic stop for the illegal window tint. Officer Philip P. Watts responded and was able to get in the area quickly. Officer Watts saw as the Dodge Charger pulled into the driveway of 3001 Earlham Avenue and park. Officer Watts pulled his marked police cruiser behind the charger and activated his overhead lights. As he stopped his cruiser and exits, he requests EVANS roll down his window. EVANS opened the driver side door and steps out of the car and at that time, Officer Watts approached and made contact with EVANS. He was found to be the only person in the vehicle and was secured in the back seat of the police cruiser. Officer Watts requested a K9 unit respond to perform a free air sniff on the vehicle due to the traffic stop stemming from a narcotics investigation. EVANS was found to be in possession of **Device 1** when he was being placed in the back seat of the cruiser. As soon as the traffic stop occurred, DPD personnel returned to 1792 Vancouver Drive to maintain surveillance, pending the outcome of the traffic stop.

15.     Approximately 5 minutes later, Dayton Police K9 Officer Randy Betsinger arrived on scene with his K9 partner, Hugo. Officer Betsinger and Hugo performed a free air sniff on the vehicle which resulted in a positive alert, indicating the presence of narcotics. Officers and detectives then completed a search of the vehicle. Officer Watts immediately located the large white grocery bag that Detective Rose saw EVANS carry out of 1792 Vancouver Drive and opened it. Inside the bag, Officer Watts located several items of evidentiary value, to wit: a .40 caliber 50

5

round drum style magazine with was loaded with 50 live .40 caliber rounds, an extended .40 caliber Glock magazine which was loaded with 13 live rounds, a box of Magtech brand .40 caliber ammunition which was full with 50 rounds, a box of Winchester brand .22 long rifle ammunition which contained 75 rounds, a box of Winchester brand .22 long rifle ammunition with contained 96 rounds, and a large Ziploc baggie which contained a variety of .38 special ammunition, 9mm ammunition and .40 caliber ammunition. Officer Betsinger searched the driver's compartment under the steering wheel and located a Glock model 26, 9mm pistol with serial number UYZ167, which was loaded with 10 rounds. This firearm was concealed between the steering column and the piece of plastic molding surrounding it, which was easily accessible by EVANS.

16.     As the traffic stop progressed, Detective Rose learned of EVANS' extensive criminal history, to include being on post release control with the Department of Justice. Learning this, Detective Rose contacted Your Affiant and Affiant responded to the Dayton Police Department Safety Building, which is located at 335 West Third Street, to attempt to interview EVANS. Detectives attempted to interview EVANS, however he refused to answer questions without a lawyer present at that time. EVANS was subsequently transported and booked into the Montgomery County Jail. **Device 1** was collected as evidence and tagged into the DPD property room. During booking, EVANS provided officers with his phone number. That phone number was consistent with the number provided to officers by Individual 2.

17.     Detective Rose then authored a search warrant for 1792 Vancouver Drive, given the firearm and large amount of ammunition and magazines being located during the traffic stop. This search warrant was signed by Dayton Municipal Court Judge Mia Wortham-Spells on May 4, 2021 at 2219 hours. Members of the DPD Narcotics Bureau and Community Problem Response Team (CPRT) served the search warrant on 1792 Vancouver Drive immediately after. No people

were located inside the house, however there were several additional items of evidentiary value located, including but not limited to: 2 additional loaded firearms, electronic recording devices, a small baggie of suspected cocaine, and items of possessory interest linking EVANS to this address. All these items were collected and placed into the DPD property room as evidence. Additionally, the **Device 2** was located on the bathroom countertop, which was directly next to the toilet. Detectives located a baggie, containing a small amount of a pinkish powder, floating in the toilet. The pinkish powder field tested positive for the presence of cocaine. **Device 2** was collected and tagged into the property room along with the other evidence.

18. From my training and experience, firearms are commonly possessed by traffickers as a means of intimidating customers or other traffickers, and to protect the trafficker from robbery. In this case, a firearm was recovered from the vehicle EVANS was driving and multiple additional firearms were recovered at 1792 Vancouver Drive.

19. At the retail level, traffickers often use cellular telephones to arrange transactions with their user-customers, often directing the customer to locations where the trafficker can meet them in a car (sometimes rental cars) and do a quick hand-to-hand exchange. In addition to using texts to arrange a single sale, it is common for traffickers to send text messages to the users informing them of price or the availability of a new supply of drugs (sometimes in a mass text to several people simultaneously). Traffickers commonly store the names and phone number of their user-customers, as well as those involved in the drug trafficking with the trafficker (sometimes under alias or code names). Because cellular phones often have digital cameras built-in to the phone, it is common for traffickers to take pictures of themselves, their associates, proceeds, and other evidence of drug trafficking and/or weapon possession. Cellular phones can also store photographs sent to the phone electronically. In this case, Individual 2 was able to provide a phone

7

number for EVANS and stated that Individual 1 communicated with EVANS via an application on Individual 1's telephone. Officers examined Individual 1's phone and saw a contact between that device and the phone number Individual 2 had supplied for EVANS.

20.     It is common for traffickers to possess multiple phones because they may be transitioning from sales on a particular phone to another phone as a law enforcement countermeasure, and because traffickers may use one phone to talk to customers while using other phones to communicate with a supplier or associate. In this case, EVANS was in possession of **Device 1** at the time of his arrest and **Device 2** was located in his house.

21.     Based on the above facts, Affiant asserts there is probable cause to believe that evidence of violations of 21 U.S.C. § 841(a)(1), "Possession with intent to distribute a controlled substance" and 18 U.S.C. § 922(g)(1) and 924(a)2), "Being a Felon in Possession of a Firearm;" may be found on the Device. From training and experience, Affiant is aware that it is not uncommon for individuals to possess photographs of firearms or photographs of themselves handling firearms in their phones. It is also common to discover evidence of the source of firearms and/or documentation of the sale or transfer of firearms between individuals. Affiant also believes additional evidence may be discovered related to additional crimes. Affiant requests the search warrant to search the Device listed in Attachment A for evidence of those violations as set forth in Attachment B.

22.     The **Devices** are currently stored at the Dayton Police Department, 335 West Third Street, Dayton, Ohio (within the Southern District of Ohio). In my training and experience, I know that the **Devices** have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Dayton Police Department.

8

## TECHNICAL TERMS

23.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include

9

various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When

10

a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

24. Based on my training, experience, and observation of the **Devices**, I know that the **Devices** have the capability to serve as cellular telephones, digital cameras, portable media players, GPS navigation devices, and PDAs. In my training and experience, examining data stored on

11

devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, where the user of the device was located, and with whom the user of the device was communicating.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on a device.  This information can sometimes be recovered with forensics tools.

26.     *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.   Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw

12

conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

28. *Manner of execution.* Because this warrant seeks only permission to examine the Devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

29.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

DUSTIN J. PHILLIPS
TASK FORCE OFFICER
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn to before me on May 7, 2021:

Sharon L. Ovington
United States Magistrate Judge

14

## ATTACHMENT A

The property to be searched are two cellular phones (hereinafter collectively the **"Devices"**) currently located at the Dayton Police Department, located at 335 West Third Street, Dayton, Ohio. The **Devices** are depicted and described below:

a. Apple iPhone, white in color (**"Device 1"**);



b.   Motorola touch screen phone, black in color ("**Device 2**").



This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

2

## ATTACHMENT B

1.      All records on the **Devices** described in Attachment A that relate to violations of 21 U.S.C. § 841(a)(1), "Possession with intent to distribute a controlled substance" and 18 U.S.C. § 922(g)(1) and 924(a)2), "Being a Felon in Possession of a Firearm;" involving Michael Evans, including:

   a.   lists of drug customers and related identifying information;

   b.   types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c.   any information related to sources of drugs or others involved in the possession or distribution of drugs (including names, addresses, phone numbers, or any other identifying information);

   d.   any information regarding the acquisition, use, or possession of firearms;

   e.   any information related to the acquisition of rental cars or cellular phones.

2.      Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

2